1        IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TENNESSEE
2            WESTERN DIVISION

3  _____

   EQUAL EMPLOYMENT OPPORTUNITY
4    COMMISSION,

5          Plaintiff,

6

7   Vs.               Case No. 05-2718 D/P

8

9

10  SCI TENNESSEE FUNERAL SERVICES, INC.
    d/b/a MEMPHIS FUNERAL HOME and
11  FAMILY FUNERAL CARE,

12         Defendant.

13  _____

14     THE DEPOSITION OF JAMES KRIEGSHAUSER, JR.
          July 20, 2006
15

16  _____

17

18

19

20             COPY

21

22       ALPHA REPORTING CORPORATION
    Saprena Hagan Smith, RPR, CCR, CSR
23         236 Adams Avenue
     Memphis, Tennessee  38103
24        (901) 523-8974

25

1        The deposition of JAMES KRIEGSHAUSER, JR.,

2    taken on behalf of the Plaintiff, pursuant to

3    Notice, on July 20, 2006, beginning at approximately

4    1:30 p.m., in the offices of Carson L. Owen, Esq.,

5    Equal Employment Opportunity Commission, Memphis

6    District Office, 1407 Union Avenue, Suite 621,

7    Memphis, Tennessee .

8        This deposition is taken in accordance with

9    the terms and provisions of the Federal Rules of

10   Civil Procedure.

11       All forms and formalities are waived, and

12   objections as to relevancy, materiality and

13   competency are reserved, to be presented at or

14   before the hearing.  Objections as to the form of

15   the question must be made at the time of the taking

16   of the deposition.  The signature of the witness is

17   not waived.

18

19

20

21

22

23

24

25

```
 1                        APPEARANCES

 2

     FOR THE PLAINTIFF:
 3
                         CARSON L. OWEN, ESQ.
 4                       United States Equal Employment
                            Opportunity Commission
 5                       Memphis District Office
                         1407 Union Avenue
 6                       Suite 621
                         Memphis, Tennessee  38104
 7                       (901) 544-0133

 8

 9

10   FOR THE DEFENDANT:

11                       MAURICE WEXLER, ESQ.
                         STEPHEN GOODWIN, ESQ.
12                       Baker, Donelson, Bearman, Caldwell
                            & Berkowitz, P.C.
13                       2000 First Tennessee Building
                         Memphis, Tennessee  38103
14                       (901) 526-2000

15

16   ALSO PRESENT:

17                       MR. E.C. DAVES
                         President
18                       Memphis Funeral Home
                         Post Office Box 17069
19                       Memphis, Tennessee  38187-0069

20

21   REPORTED BY:

22                       MS. SAPRENA HAGAN SMITH
                         Registered Professional Reporter
23                       Alpha Reporting Corporation
                         236 Adams Avenue
24                       Memphis, Tennessee  38103
                         (901) 523-8974
25
```

4

1                        INDEX

2
     WITNESS:                        PAGE NUMBER
3

4          JAMES KRIEGSHAUSER, JR.

5    Direct Examination
     By Mr. Owen --------------------   5
6
     Cross-Examination
7    By Mr. Goodwin -----------------   56

8

9    EXHIBITS

10   Exhibit 1  ----------------------   18
     Exhibit 2  ----------------------   20
11   Exhibit 3  ----------------------   21
     Exhibit 4  ----------------------   24
12   Exhibit 5  ----------------------   30
     Exhibit 6  ----------------------   37
13   Exhibit 7  ----------------------   58
     Exhibit 8  ----------------------   59

14

15

16

17

18

19

20

21

22

23

24

25

1                    MR. OWEN:   EEOC requests that the

2      court reporter submit the deposition transcript to

3      the deponent for changes and signing in accordance

4      with Federal Rules of Civil Procedure 30(e).

5                    JAMES KRIEGSHAUSER, JR.,

6           having been first duly sworn, was examined

7                    and testified as follows:

8                    DIRECT EXAMINATION

9      BY MR. OWEN:

10     Q.        What is your full name, sir?

11     A.        James Jerome Kriegshauser, Jr.

12     Q.        And your address?

13     A.        1909 Oak Shadow Way -- three words --

14     Waxhaw -- W-A-X-H-A-W -- North Carolina.

15     Q.        And the zip?

16     A.        28173.

17     Q.        Mr. Kriegshauser, during this deposition,

18     it's important that you understand my questions.  If

19     at any point you don't understand one of my

20     questions, will you tell me that so that I can have

21     the question read again or I can try to rephrase it

22     to make it more understandable for you?

23     A.        Yes, sir.

24     Q.        Thank you.  Also, if at any time you

25     realize that an answer you've given to a question is

1    you remembered giving a deposition was about a year

2    ago?  Have I got that right?

3    A.        Approximately.  I cannot recall exactly

4    when.

5    Q.        That's fine.  Was that in a lawsuit?

6    A.        I could not tell you if it was at that

7    level at that point.

8    Q.        Okay.  Can you tell me what kind of

9    dispute you were giving a deposition in, if it was a

10   dispute?

11   A.        I could not recall exactly what it was.

12   You know, I'd have to go back, and someone would

13   have to take a look at the exact records.

14   Q.        Yes, sir.

15   A.        To the best of my recollection, it had

16   something to do with a consumer that was not

17   satisfied with the services.

18   Q.        Do you remember how long ago the last

19   deposition before that one was?

20   A.        No, sir.

21   Q.        Are you employed?

22   A.        Yes, sir.

23   Q.        Who is your employer?

24   A.        SCI North Carolina Funeral Services,

25   Incorporated.

1    Q.        And what is your job there?

2    A.        I am the market director.

3    Q.        How long have you been in that job?

4    A.        Approximately three and a half years.

5    Q.        In that job do you have any

6    responsibilities over SCI funeral homes in Memphis?

7    A.        No, I do not, sir.

8    Q.        Okay.  The reason I'm looking a little

9    confused is I thought at some point you did have

10   responsibilities over funeral homes in Memphis more

11   recently than that.  That's why I'm looking

12   confused.

13             Let's see if we can sort it out.  Three

14   and a half years ago by my calculation, since we're

15   in July 2006, would have been around January 20th of

16   2003?  Does that sound right?

17   A.        January the 20th?  Yes.  That sounds

18   correct.

19   Q.        Do you remember when it was that you

20   started your market director job with SCI North

21   Carolina?

22   A.        The approximate date was November.  I'd

23   have to look at the exact.  I believe it was 2001.

24   Q.        Since November 2001.

25   A.        I'd have to look to make sure that that

1    was accurate.

2    Q.        All right.

3                    MR. OWEN:  Let's go off the record

4    just a minute.

5                    (off the record)

6    Q.        (BY MR. OWEN) I understood you to say, and

7    please correct me if I am wrong, that your current

8    employer is SCI North Carolina Funeral Services,

9    Inc.; is that correct?

10   A.        That's correct.

11   Q.        And you're the market director there.

12   A.        That's correct.

13   Q.        And as the marketing director for that

14   company, do you have any responsibilities over

15   funeral homes in Memphis?

16   A.        My area responsibility is North Carolina,

17   South Carolina, West Virginia, and Tennessee.  I

18   have market directors that report to me -- excuse

19   me, market managers that report to me.  Those

20   funeral homes report to that market manager.

21   Q.        Okay.  So the funeral homes indirectly

22   report to you through a market manager.

23   A.        There you go.

24   Q.        I think we're zeroing in.  It just threw

25   me because I thought we were dealing with SCI

1    reported to Mr. Daves and who also supervised below

2    him the pre-need salespeople?

3    A.        Yes, there was.

4    Q.        Do you remember who that was?

5    A.        David --

6    Q.        Was it David Dixon?

7    A.        David Dixon, yes.  Thank you.

8    Q.        Sure.  At the time you became market

9    director, was there an employee in the Memphis area

10   named Paul McCarver?

11   A.        Yes, sir.

12   Q.        What was Mr. McCarver's job?

13   A.        At that time I believe it was location

14   manager.

15   Q.        Now, what was he responsible for as

16   location manager?

17   A.        Operations of the funeral home on an

18   at-need basis.

19   Q.        What do you mean by on an at-need basis?

20   A.        Was not responsible for pre-need sales.

21   Q.        And what location was he manager of?

22   A.        Memphis Poplar.

23   Q.        As the location manager -- let me back up

24   a minute.  At Memphis Poplar, were there pre-need

25   salespeople employed at the time you took over as

```
 1    market director?
 2    A.        Yes, sir.
 3    Q.        Okay.  As location manager, did
 4    Mr. McCarver have any supervisory responsibilities
 5    with respect to those pre-need sales employees?
 6    A.        No, sir.
 7                   MR. OWEN:  I'll ask the court
 8    reporter to mark this as Exhibit 1 to this
 9    deposition.
10              (Document marked as Exhibit 1.)
11    Q.        (BY MR. OWEN) I'm handing you what's been
12    marked as Exhibit 1 to this deposition.  Take your
13    time and look over that and, if you can, tell me
14    what that is.
15    A.        This is an inside sales counselor's
16    compensation program that has been signed off by the
17    counselor and the sales manager.
18    Q.        And what was an inside sales counselor
19    responsible for?  What kinds of sales?
20    A.        They were responsible for selling a
21    prearranged funeral.
22    Q.        So was this a pre-need sales position?
23    A.        Yes, sir.
24    Q.        Was this also sometimes referred to as a
25    family service counselor?
```

1    A.        Yes, sir.

2    Q.        On the first page, is it the same job

3    we're talking about?

4    A.        It appears to be.

5    Q.        All right, sir.  Looking at the last page

6    again of both of Exhibits 1 and 2, at the very top

7    it says "Table 13 - Major (PAF only)."  What does

8    "PAF only" mean?

9    A.        Prearranged funeral only.

10             MR. OWEN:  I'll ask the court

11   reporter to mark this document Exhibit 3 to this

12   deposition.

13             (Document marked as Exhibit 3.)

14   Q.        (BY MR. OWEN) You've been handed what's

15   been marked as Exhibit 3 to this deposition.  Take

16   your time and look over that and then tell me, if

17   you can, what that is.

18   A.        In appears to be a blank copy of a family

19   service counselors 2004 draw-plus compensation

20   program.

21   Q.        And do you see on the bottom left of the

22   first page in rather small type where it says

23   "Rev 03/01/04a"?

24   A.        Yes, sir.

25   Q.        What does that mean?  Do you know?

```
 1    A.          Revised 03/01/2004?  I don't know what the
 2    "a" stands for.
 3    Q.          All right, sir.  Did this compensation
 4    plan develop under your supervision or at some
 5    higher level in the organization?
 6    A.          The plans are designed above my level of
 7    responsibility.
 8    Q.          Okay.  So at some point did you receive
 9    this plan for implementation?
10    A.          Yes, sir.
11    Q.          All right.  When that happened, did you
12    receive any sort of explanatory memorandum with it
13    telling you what you were supposed to do or why the
14    change was occurring?
15    A.          Sir, to the best of my knowledge, I'm sure
16    I probably did.  I don't recall exactly what
17    specific -- what particular time for this one, but
18    I'm sure I definitely received direction.
19    Q.          I'd like to ask if you would look through
20    your records, and if you have such a memorandum
21    showing when you got this and what the explanation
22    of it was, if you would provide that to the
23    company's lawyers so they can decide whether they're
24    willing to provide it to me.
25                I'm just looking for a little more context
```

1    about how it was explained when it happened.

2    A.       Sure.

3    Q.       Thank you.  I notice in the back pages of

4    Exhibit 3 up at the top of the pages there are

5    references to gold, silver, and bronze.  I don't see

6    any other metals mentioned.  Do you know what that

7    means, gold, silver, and bronze?

8    A.       Just names of the different levels of

9    compensation.

10   Q.       And what was your understanding of which

11   of those would apply to a particular funeral home?

12   A.       I'd have to look at an exact time.  I

13   believe, if my memory serves me correct, this is

14   when we went to a location-based designation which

15   means depending on the revenue responsibility of

16   that location would designate whether or not those

17   counselors were bronze, silver, or gold.

18   Q.       What do you mean by "revenue

19   responsibility"?

20   A.       Just whatever the revenue of that

21   location -- I mean, different sizes of location,

22   some produce more revenue than others.

23   Q.       I may not be summarizing this or

24   rephrasing this accurately, but it sounds like it

25   was going to be based on the past sales at that

```
 1    facility?  Is that a fair way to say it or did I
 2    misunderstand?
 3    A.          That would be part of the criteria,
 4    absolutely, to determine what the revenue is.
 5    Q.          And what would it be besides past sales at
 6    that location?
 7    A.          To the best of my knowledge, I can't think
 8    of anything else that would really determine
 9    whether -- it's just simple revenue calculations.
10    Q.          So that would determine whether employees
11    at a particular facility, at a particular funeral
12    home, were placed under a bronze, silver, or gold
13    plan?  Do I understand that correctly?
14    A.          You understand that correctly.  However, I
15    would have to go look at if this was the exact time
16    when we went to a location designation or not.
17    Q.          Okay.  Okay.  This next exhibit may help
18    us with that, so I'll go ahead and bring it in at
19    this point.
20                     MR. OWEN:  I'll ask the court
21    reporter to mark this Exhibit 4 to this deposition.
22                     (Document marked as Exhibit 4.)
23    Q.          (BY MR. OWEN) You've been handed what's
24    been marked as Exhibit 4 to this deposition.  Take a
25    look at that and compare it with Exhibit 3.
```

```
 1                        The only difference I have picked up
 2    so far is the revision date in the bottom left
 3    corner on the -- on all the pages.  On Exhibit 4 it
 4    says 6/28/04, and on Exhibit 3 it says 3/1/04.
 5                        And if there are other differences
 6    in the two exhibits, they have alluded me.  So I
 7    guess I'm asking you to help me.  If there are
 8    differences in the two other than the revision date,
 9    if you would point those out to me.
10    A.        Sir, without taking the time to go through
11    line item by line item, I mean, I'm -- I mean, we
12    could do that if that's what you're looking for.
13                        Other than the revision date, I can tell
14    you that one of the obvious definitions in my
15    opinion, I don't know if you noticed, but all of the
16    plans are $8 an hour, where in this one --
17    Q.        In this one you're now saying is
18    Exhibit 3?  I'm just trying to get the record --
19    you're saying $8 an hour.  That's what's in
20    Exhibit 4?
21    A.        Exhibit 4, $8 an hour.  If you look
22    through --
23    Q.        I see now.
24    A.        The bronze, silver, and gold are all $8 an
25    hour as the base wage.
```

1    Q.        And then in Exhibit 3 they're differing

2    dollar amounts?

3    A.        That is correct, sir, as I see it.

4    Q.        So the hourly wage sort of equalized in

5    the June 28th, '04, revision to $8 an hour for

6    everybody; is that correct?

7    A.        That's correct.

8    Q.        Where under the Exhibit 3 revision,

9    3/1/04, it would vary based on whether you were

10   under -- which of the plans you were under.

11   A.        That is correct.

12   Q.        All right.  And am I correct -- I just

13   remembered this.  Am I also correct that there's a

14   difference in the two plans as far as minimum sales

15   required at the bronze level?  And let's be even

16   more specific, bronze level, PAF only.

17                MR. GOODWIN:  You want to refer to

18   page numbers, Carson?  Maybe that will help.

19   Q.        (BY MR. OWEN) Yeah.  I'm looking at

20   Exhibit 3 at the page that in the bottom right is

21   numbered D00026, and I notice at the top that says

22   "Bronze - (PAF only)."

23                Let me look through and see.  I

24   think that's the only page that says that, but I may

25   be wrong.  I'm just trying to get a little help from

```
 1    you.

 2    A.        Sure.

 3    Q.        Because both of these have been rather

 4    confusing to me.  I'm trying to see where the PAF --

 5    "Bronze - (PAF only)" page is on Exhibit 4.  I'm

 6    open to anybody that spies it before I do.

 7    A.        D00041?  Is that it?

 8    Q.        I believe you're right.

 9    A.        What was your question again?

10    Q.        I wanted to find out if the minimum

11    monthly sales changed between Exhibit 3 and

12    Exhibit 4 with respect to bronze level-PAF only.

13              And now that I look at these two pages, it

14    doesn't look like it did.  Am I right?  Is it 20,000

15    under both plans?

16    A.        That's how I understand it.

17    Q.        I think it's coming a little back into my

18    memory.  In Exhibit 4, I'm going to look now for the

19    page that's silver-PAF only.  I think I remember

20    that being -- it looks like it's D00042.  That's

21    where it was.  Do you see that?

22    A.        D00 --

23    Q.        D00042 in Exhibit 4.

24    A.        Okay.

25    Q.        That has a minimum monthly sales of, if I
```

1    am looking at it correctly, 35,000 a month?

2    A.        That is correct.

3    Q.        So looking in Exhibit 3, Page D00026, the

4    bronze-PAF only, and looking in Exhibit 4 at the

5    Page No. D00042, and I realize that D00026 is

6    bronze-PAF only and D00042 is silver-PAF only.

7              But if a location was changed under the

8    Exhibit 3 plan, changed from bronze-PAF only under

9    the Exhibit 3 plan and changed to silver-PAF only

10   under the Exhibit 4 plan, am I correct that the

11   minimum required monthly sales would have increased

12   from 20,000 to 35,000 a month?

13   A.        That is correct.  If they were moving from

14   bronze to silver, the gate would go up.

15   Q.        And did that happen with respect to the

16   Memphis Funeral Home Poplar location when Exhibit 4

17   was implemented?

18   A.        When Exhibit 4 was implemented, and this

19   is -- having both documentations is helping my

20   memory.  But if memory serves me correct, this is

21   when we went to location-based.

22   Q.        By "this," you're tapping with your

23   fingers Exhibit 4?

24   A.        Exhibit 4.  Exhibit 4 throughout my entire

25   area of responsibility, we went to location-based.

1    Q.          So when Exhibit 4 came in, everything went

2    to location-specific.

3    A.          Correct.

4    Q.          And that means it was based on the prior

5    sales history at that location and determined

6    whether you were bronze or silver or gold.

7    A.          Exactly.

8    Q.          Okay.

9    A.          That's correct.

10   Q.          And when Exhibit -- well, let me back up a

11   minute.  You said Exhibit 3 was developed at some

12   level above your level of responsibility and then

13   came to you, you think maybe with a memo; is that

14   correct?

15   A.          All of these plans were developed at a

16   level above me.

17   Q.          That's what I was getting to about

18   Exhibit 4.  Do you think it's possible Exhibit 4

19   came to you with a memo explaining it also?

20   A.          Yes, sir.

21   Q.          Would you also look for that memo; and if

22   you find it, give a copy to the company's lawyers so

23   they can decide whether they're giving it to me?

24   A.          Let me make a correction.

25   Q.          Sure.

```
1    A.          It may not be a memo, but it came in some

2    form of communication.  And I'll make sure that

3    you --

4    Q.          What I'm after is if anything came to you

5    other than what's in Exhibit 3 and 4 that explains,

6    here's what we're doing and why we're doing it,

7    that's what I'm after, something to maybe give a

8    broader explanation of this change.  Okay?

9    A.          I understand.

10   Q.          I appreciate you checking on that for me.

11               MR. OWEN:   I'll ask the court

12   reporter to mark this document Exhibit 5 to this

13   deposition.

14               (Document marked as Exhibit 5.)

15   Q.          (BY MR. OWEN) I'm handing you what's been

16   marked as Exhibit 5 to this deposition.  If you

17   would compare that to Exhibit 3 and tell me, please,

18   if those two are related and if so, how.

19   A.          They appear to be similar family service

20   counselor 2004 draw-plus compensation.  Exhibit 5 is

21   executed, it appears, by Patricia Levine, signed on

22   March 1st of 2004, and then also signed by David

23   Dixon on March 4th of 2004 and then by E.C. Daves on

24   March the 8th.

25   Q.          In comparing Exhibit -- well, comparing
```

1                    COURT REPORTER'S CERTIFICATE

2     STATE OF TENNESSEE:

3     COUNTY OF SHELBY:

4            I, SAPRENA HAGAN SMITH, Registered
      Professional Reporter, Certified Court Reporter, and
5     Notary Public for Shelby County, Tennessee,
      DO HEREBY CERTIFY THE FOLLOWING:
6
             1. The foregoing deposition was taken before
7     me at the time and place stated in the foregoing styled
      cause with the appearances as noted;
8
             2. Being a Court Reporter, I then reported the
9     deposition in Stenotype to the best of my skill and
      ability, and the foregoing pages contain a full, true
10    and correct transcript of my said Stenotype notes then
      and there taken;
11
             3. I am not in the employ of and am not
12    related to any of the parties or their counsel, and I
      have no interest in the matter involved.
13

14

15          WITNESS MY SIGNATURE, this, the 25th day

16    of September          , 2006.

17

18

19          _____

20          SAPRENA H. SMITH,
            RPR, CCR, and Notary Public
21          For the State of Tennessee
            At Large***
            TN CCR# 0316
22

23

24    My commission expires:
      August 30, 2010
25